## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

EDGEWOOD HIGH SCHOOL      )
OF THE SACRED HEART, INC.,    )
                                       )
      Plaintiff,             )          Case No. 3:19-cv-683
                                       )
      v.                  )          JURY TRIAL DEMANDED
                                       )
CITY OF MADISON, WISCONSIN;  )
CITY OF MADISON ZONING BOARD )
OF APPEALS; Zoning Administrator )
MATTHEW TUCKER, in his official  )
capacity; and Director of Madison's Building )
Inspection Division GEORGE HANK,  )
in his official capacity,          )
                                       )
      Defendants.          )

---

## COMPLAINT

---

Plaintiff Edgewood High School of the Sacred Heart, Inc., by its undersigned attorneys, files this complaint against Defendants City of Madison, Zoning Administrator Matthew Tucker, in his official capacity, and Director of Madison's Building Inspection Division George Hank, in his official capacity, and alleges:

### INTRODUCTION

1.     For nearly a century, Edgewood High School of the Sacred Heart, Inc., a/k/a Edgewood High School ("Edgewood") has used its on-campus athletic field to host athletic contests and other activities in furtherance of its religious mission and values.  However, the City and its officials have now imposed the City's land use regulations in an arbitrary, unequal, and unlawful manner to prohibit Edgewood and its students from using the field for anything other than team practices and physical education classes.  All of the City's public high schools and the

University of Wisconsin-Madison share the same zoning classification as Edgewood, yet the City is imposing these restrictions on Edgewood alone.

2.     Further, the City is refusing to deliver to Edgewood the electrical permit needed to install outdoor lighting around the field and provide for the safety of those engaging in activities at night.  The City is withholding the permit even though it approved Edgewood's lighting application for compliance with the City's lighting and zoning ordinances on February 27, 2019 and March 1, 2019, respectively.

3.     This civil action challenges the arbitrary, unequal, and unlawful manner in which the City is imposing its land use regulations to restrict Edgewood's use of its field and the City's refusal to issue Edgewood its electrical permit. Edgewood asserts federal claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc et seq., the United States Constitution, and state law claims over which this Court may exercise supplemental jurisdiction.

## THE PARTIES

4.     Edgewood is a Catholic high school founded in 1881 by the Congregation of the Dominican Sisters of Sinsinawa (the "Dominican Sisters of Sinsinawa").

5.     In 1893, the Dominican Sisters of Sinsinawa moved the school, then known as Sacred Heart Academy, to a property located on the shore of Lake Wingra in Madison, Wisconsin.

6.     The Sisters renamed their academy to Sacred Heart Academy at Edgewood in 1895 and then opened the doors to Edgewood High School of the Sacred Heart in 1927.

7.     Edgewood has operated continuously on its site located at 2219 Monroe Street in Madison since 1927.

4844-6381-4818.1

8.      Edgewood shares its campus with its two sister institutions, Edgewood College and Edgewood Campus School.

9.      While all three institutions have been and remain under the sponsorship of the Dominican Sisters of Sinsinawa, each was separately incorporated in 2011.

10.     Edgewood is organized as a Wisconsin nonprofit corporation.

11.     Edgewood is a "religious institution" under RLUIPA, 42 U.S.C § 2000cc et seq.

12.     Defendant City of Madison (the "City") is a municipality in Dane County, Wisconsin.

13.     The City is a "government" under RLUIPA, 42 U.S.C. § 2000cc-5(4)(A), and is responsible for its ordinances as well as the acts, omissions, and interpretations of its zoning administrator, agents, boards, and councils.

14.     Defendant Matthew Tucker ("Tucker") is the City's Zoning Administrator and is sued in his official capacity.  As Zoning Administrator, Tucker is overseen by the Building Inspection Division Director.

15.     Defendant George Hank ("Hank") is the Director of the City's Building Inspection Division and is sued in his official capacity.  As Director of the Building Inspection Division, Hank oversees is the Zoning Administrator, Tucker.

16.     Defendant City of Madison Zoning Board of Appeals ("Zoning Board") is a municipal board established by Wis. Stat. § 62.23(7)(e) and Madison Gen. Ordinance (M.G.O.) § 28.205.  The Zoning Board has the jurisdiction and authority to, among other things, hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by the Zoning Administrator in the enforcement of Madison's zoning laws.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this case pursuant to 28 USC § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution; under 28 USC § 1343(a)3, in that it is brought to redress deprivations under color of state law of rights, privileges and immunities secured by the United States Constitution; under 28 USC § 1343(a)4, in that it seeks to recover equitable relief under acts of Congress, specifically 42 USC § 1983 and 42 USC § 2000cc, which provide causes of actions for the protection of civil and constitutional rights, injunctive remedies and damages, and under 28 § 2201(a), to secure declaratory injunctive relief under 28 USC § 2202; and under 42 USC § 1988, to secure reasonable attorney fees as part of the case. This Court may also exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the Western District of Wisconsin and at least one defendant resides in this district.

## THE PROPERTY AND FIELD AT ISSUE

19.     Since the 1920's, Edgewood has had an athletic field and track located on its campus at 2219 Monroe Street.

20.     A new football field was installed for the 1930-31 school year.

21.     On November 7, 1930, the new field was blessed and consecrated to God. Father Leo officiated the ceremony, and the entire student body was present for the field's dedication.

22.     Below are photographs of the field and track taken over the years:



ter to it when he caught it or was running with it."

oby Feeney and his fellow Maroons opened the 1929
27 at the primitive field on the Edgewood campus where
ominican nuns once grazed.

football field renovation project that will ultimately

The 1929 Edgewood High School football team continued to play its games on a primitive field along Monroe Street. Note the Model-T Ford in the left background. *1930 EHS Yearbook*

(Photo: 1929 Edgewood football game at Monroe Street field)



(Photo: 1930 Edgewood football game on field with school in the background)



ys explains his success."

of the Depression, Edgewood
ly, enrollment increased to a

An Edgewood halfback breaks loose for a long run during a 1931 football game played on the new Edgewood High School football field. *1932 EHS Yearbook*

(Photo: 1931 Edgewood football game at current Woodrow Street field location)

4844-6381-4818.1



(Photo: 1932 Edgewood football game at current Woodrow Street field location)



(Photo: Edgewood High School's Track & Athletic Field 1937 on the right).



(Photo: Edgewood football field and track in 2015)

23.     For nearly a hundred years, Edgewood has lawfully and openly used its track and field to host athletic contests and other activities.  Athletic contests held on the field further Edgewood's religious mission and values, and always have.

24.     In or about April 1997, Edgewood submitted to the City an approved "Stormwater Management Plan" (dated April 7, 1997) which indicated that Edgewood would be replacing its old track and field with "a new 400 meter running track with soccer/football field and underdrain system."  **Exhibit A**, Edgewood High School Master Plan (2014) (hereinafter "Edgewood Master Plan"), at A.3.

25.     Edgewood began a renovation project in 2015 to "rebuild [ ] its athletic field and track," creating "cutting-edge running surfaces for track and field training as well as state-of-the-art artificial turf for outdoor sports, including football, baseball, softball, soccer, track, and lacrosse."  **Exhibit B**, Edgewood High School, Our History (2019).

26.     This 2015 renovation also included installation of a new scoreboard:



27.     Today, the track and field is named the Goodman Athletic Complex.

## EDGEWOOD'S RELIGIOUS LAND USE

28.     Through sponsorship of Edgewood, the Dominican Sisters of Sinsinawa carry out their religious mission to teach and to preach.

29.     In furtherance of the sincerely held religious beliefs of the Dominican Sisters of Sinsinawa and of Edgewood, Edgewood's mission is to "educate the whole student for a life of learning, service, personal responsibility through a rigorous academic curriculum that embraces the Sinsinawa Dominican values of Truth, Compassion, Justice, Partnership and Community." **Exhibit C**, Edgewood Mission Statement.

30.     For nearly a century, athletics has been a primary way in which Edgewood accomplishes its Catholic mission to educate the whole student, teach personal responsibility, and instill and promote the Sinsinawa Dominican values.

31.     Edgewood is not seeking to use its track and field exclusively for athletic events—even though athletics are integral to the school's primary religious mission and are engaged in in furtherance of the school's sincerely held religious beliefs.  Edgewood is also seeking to be free to engage in inherently religious activities such as community outreach, evangelism, fellowship, assembly, prayer and worship on the field.  Athletic events and the field provide the context and platform for these inherently religious activities to be shared with the community in furtherance of the school's religious mission and values.  They are also all allowable uses under M.G.O. § 28.097.  **Exhibit D** Relevant Portions of Madison General Ordinances.

32.     Edgewood's athletics teams are called the Edgewood Crusaders.

33.     As listed on the Edgewood Crusaders Athletics website, the goals of Edgewood Athletics are to:

4844-6381-4818.1

- Promote the mission and goals of Edgewood High School

- Maintain Christian, sportsmanlike behavior at all times

- Improve motor skills

- See the need for better health and physical fitness

- Promote a desire to succeed and excel

- Foster the development of moral and ethical standards

- Learn the high ideals of fairness in all human relationships

- Learn to make proper decisions under pressure

- Enjoy competition and comradeship.[1]

34.    Athletics is also a primary way Edgewood students connect with each other and experience the Dominican value of community.

35.    Through athletics, Edgewood students develop discipline, character, and unity.

36.    By hosting athletics on its field, Edgewood is able to draw people to its campus and display its values to the community.

37.    Edgewood students, athletes, and coaches often pray before athletic contests.

38.    Edgewood offers students the ability to participate on twenty-five different boys or girls sports teams.

39.    Approximately 75% of Edgewood students participate in athletics.

40.    Edgewood athletics provides a unique opportunity to educate, congregate in community, recreate, and celebrate the school's values.

41.    Edgewood athletics is critical to the school's mission to increase enrollment.

---

[1] Edgewood Crusaders Athletics, Goals of Edgewood Athletics
https://www.edgewoodcrusadersathletics.com/goalsofathletics (last visited Aug. 2, 2019).

4844-6381-4818.1

42.     In furtherance of the Sinsinawa Dominican values of Compassion, Justice, Partnership and Community, part of Edgewood's religious mission is to provide an alternative option to the underserved communities in Madison and to increase the racial and ethnic diversity of the school. The strength and appeal of Edgewood's athletics program is a key way Edgewood is able to reach and attract students from these underserved communities.

43.     For nearly a century, Edgewood's high-school teams have continuously used its athletic field for events like football, soccer, track and field, baseball, and summer sports camps.

44.     For example, Edgewood hosted multiple football games and soccer games on the athletic field during the 2018-19 academic year.

45.     Since 1999, Edgewood has hosted numerous track meets (including parochial meets and meets for youth on the West Side of the City) on the field.

46.     Lacrosse matches have been regular events on the field since 2015.

47.     Since at least 1999, the field has included bleachers for fans.

48.     Beyond student athletic contests, Edgewood has also through the years allowed the community to access the field and other parts of its property for recreational purposes, including the Monroe Street Farmers' Market.

49.     Edgewood has also hosted other activities on its athletic field in furtherance of its religious mission and values and is compelled by its sincerely held religious beliefs to use the field for other religious uses related to the school's primary religious mission, including various assemblies, masses, convocations, and community events.

### THE CITY'S LAND USE REGULATIONS

50.     The City adopted its current Zoning Code on October 26, 2011, with an effective date of January 2, 2013.  *See* City of Madison ORD-12-00134.

- 10 -

51.     As part of the new code, the City created a new zoning designation called the "Campus-Institutional District," which is designed for "the City's major educational and medical institutions." *See generally* **Exhibit D**.

52.     Campus-Institutional Districts were created to "accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards." **Exhibit D** at M.G.O. § 28.097(1).

53.     Prior to 2013, the City zoned Edgewood as a residential district. *See* **Exhibit E**, Planning Division Staff Report on Edgewood Master Plan 6 (Mar. 24, 2014) ("Planning Division Staff Report").

54.     After 2013, as "part of the mapping of the new Zoning Code," the City zoned Edgewood as a Campus-Institutional District under Section 28.097, which remains its zoning classification today.  See **Exhibit E**, Planning Division Staff Report 6.

55.     In addition to Edgewood, the City also rezoned the following institutions, among others, into a Campus-Institutional District:  the University of Wisconsin-Madison, Madison Area Technical College, James Madison Memorial High School, Madison East High School, Madison West High School, and Madison La Follette High School.

56.     Campus-Institutional Districts are unique in Madison's Zoning Code because they do not operate under the permitted/conditional use framework applicable to other zoning districts. Rather, all "uses allowed within the Campus Institutional District are listed separately" as either primary or secondary uses under Section 28.097.  **Exhibit D** at M.G.O. § 28.091(1).

57.     The separate list is found at Section 28.097(3), which divides permitted uses in the Campus-Institutional district into "primary or secondary" uses.  **Exhibit D** at M.G.O. § 28.097(3).

- 11 -

58.     The list of permitted "primary uses" in a Campus-Institutional District includes "educational uses associated with colleges, universities, and secondary and primary schools, including classroom buildings, libraries, and offices." **Exhibit D** at M.G.O. § 28.097(3)(a)1 (capitalization altered).

59.     The list of permitted "secondary uses" includes "indoor and outdoor sports and recreational facilities"; "places of worship"; "stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's primary mission." **Exhibit D** at M.G.O. § 28.097(3)(b)5, 10, 15, 17 (capitalization altered).

60.     The term "athletic contest" is not used or defined anywhere in Madison's Zoning Code.

61.     The Campus Institutional Ordinances allow schools in Campus-Institutional Districts to use their property, by right and without seeking a permit or other approval, as outdoor sports and recreational facilities, outdoor stadiums, outdoor arenas, and for other uses related to the institution's primary mission. **Exhibit D** at M.G.O. §§ 28.097(3).

62.     Accordingly, Edgewood is entitled to use its athletic field for athletic contests as well as any other uses related to the school's primary mission as secondary uses and as a matter of law under Madison's Zoning Code.

63.     Apart from the Zoning Code, Edgewood has a legal right under Wisconsin Law to use its athletic field to host games, given its established and consistent use for that purpose beginning nearly a century ago.

**CAMPUS INSTITUTIONAL DISTRICT MASTER PLAN PROVISIONS**

64.     Under the new zoning code, institutions zoned as a Campus-Institutional District may voluntarily submit a "Campus Master Plan" to the City in order to facilitate and "guide the

- 12 -

future growth of those institutions." *Id*. at M.G.O. § 28.097(1)–(2); *see* **Exhibit E**, Planning Division Staff Report 6.

65.     To that end, a Master Plan generally includes a "description of existing conditions" and "the proposed conditions" on the campus, including "future needs/capital improvements," "phasing of proposed improvements," and "future land uses and buildings." **Exhibit D** at M.G.O. § 28.097(5)(c)(1)–(2) (capitalization altered).

66.     For institutions zoned as a Campus-Institutional District as of the effective date of Section 28.097—which includes Edgewood and all of the other institutions listed in paragraph 60 above—creation of a master plan is optional, but "[e]ncourage[d]." *See* **Exhibit D** at M.G.O. § 28.097(1)(c), (2).

67.     However, for any "District created after the effective date of this ordinance," submission of a master plan is mandatory.  **Exhibit D** at M.G.O. § 28.097(2)(a).

68.     If an institution submits a master plan, and that plan is approved by the City, then that plan governs the development of new structures within the Campus-Institutional District for the life of the plan, which is ten years.  **Exhibit D** at M.G.O. § 28.097(2)(b)–(d), (4), (7).

69.     Master plans expire ten years from when they are approved.

70.     For any "buildings properly identified on a Campus Master Plan," the District need only obtain approval from "an architectural review committee prior to construction," rather than obtain "conditional use approval" from the City.  *See* **Exhibit D** at M.G.O. § 28.097(2)(c), (7)(a); see also **Exhibit E,** Planning Division Staff Report 7.

71.     In other words, if the City approves a master plan, then "the specific projects shown on the campus Master Plan will not be reviewed by the Plan Commission [again] if those projects adhere to the approved master plan."  **Exhibit E.**

- 13 -

72.     The Campus Institutional Ordinance also allows, but does not require, those schools to submit a master Plan to create a streamlined development-approval process to accommodate their development needs during the ten year term of the master plan.

73.     Master Plans govern the development of structures, not an institution's existing or future uses of or activities on property.

74.     To date none of the City's four public high schools have submitted a master plan for approval.  Only Edgewood and the University of Wisconsin-Madison have adopted a master plan.  *See* **Exhibit F**, Planning Division, Letter to Gary Brown, dated October 4, 2017; **Exhibit G**, Planning Division Staff Report on University of Wisconsin Master Plan 8 (June 19, 2017).

## EDGEWOOD'S CAMPUS MASTER PLAN

75.     In January 2014, Edgewood voluntarily submitted a Master Plan to the City under Section 28.097.  **Exhibit A**, Edgewood Master Plan.

76.     Edgewood's Master Plan includes the requirements outlined by Section 28.097, namely a description of "existing conditions" and a description of "proposed conditions" for future development on campus.  **Exhibit A** at 5, 14–19 (Part 2), 20–51 (Part 3)); *compare* M.G.O. § 28.097(5)(c)1–2.

77.     These future developments include the construction of nineteen proposed buildings.  **Exhibit A** at 24–25.

78.     Edgewood designed its Master Plan to ensure "that all stakeholders are aware of potential future developments on campus" and to "provide a basis for implementing [Edgewood's] development decisions."  **Exhibit A** at 5.

79.     The plan "is not intended to be a detailed blueprint for construction" on Edgewood's campus.  **Exhibit A** at 5.

- 14 -

80.     The purpose of the Master Plan was not to establish Edgewood's right to continue to use the field for its existing activities.  Edgewood already had the legal right to continue those activities under both state law and Madison's Zoning Ordinances.

81.     Edgewood's Master Plan did not list all the then-existing activities which occur on Edgewood's field or the rest of Edgewood's campus as these activities were already established before Edgewood's Master Plan was submitted.  **Exhibit H**, Letter from Douglas R. Hursch to Brian Munson, dated Jan. 4, 2019.

82.     Listing all activities performed on Edgewood's athletic field was not a prerequisite for those activities to continue to be allowed during the term of the Master Plan.

83.     The City approved Edgewood's Master Plan, subject to conditions not relevant here, on April 22, 2014.  **Exhibit I**, Letter to Douglas R. Hursch dated April 22, 2014.

84.     Edgewood's approved Master Plan referenced the new, rebuilt track and athletic field.  **Exhibit A**, Edgewood Master Plan, at A.3 § 3.3.

85.     In the Planning Division Staff Report, which recommended approval of the plan to the Planning Division, the City noted that no Master Plan had yet been approved for a Campus-Institutional District.  **Exhibit E**, Planning Division Staff Report 6.

86.     Edgewood's Master Plan was the first Master Plan that the Plan Commission was ever asked to consider.  **Exhibit E**, Planning Division Staff Report 6.

87.     The City also approved Edgewood's First Amendment to its Master Plan in 2015.

### THE UNIVERSITY OF WISCONSIN'S MASTER PLAN

88.     The University of Wisconsin is zoned as a Campus Institutional District, like Edgewood.

89.     The University of Wisconsin submitted a Master Plan under the Campus Institutional District Ordinances in 2017, like Edgewood did in 2014.[2]

90.     The City approved the University of Wisconsin's Master Plan in 2017, like it approved Edgewood's in 2014.

91.     The University of Wisconsin has numerous facilities and open spaces dedicated to particular purposes, including facilities and open spaces dedicated to recreation, athletics, and athletic contests.

92.     The University of Wisconsin Master Plan only identifies a subset of all of the University's facilities and open spaces, and only a subset of the University's facilities and open spaces as being dedicated to recreation, athletics, and athletic contests.

93.     The University of Wisconsin's Master Plan only describes a very small subset of activities for any of the facilities and open spaces that it does identify.

94.     For example, the University of Wisconsin Master Plan identifies the facilities and open spaces listed immediately below dedicated to recreation, athletics, and athletic contests:

- **The Nielsen Tennis Stadium**, yet it does not state that this facility or open space is used for tennis competitions, tennis practices, or tennis summer camps, among other obvious activities for which the university has used Nielsen Stadium both before and after the effective date of its master plan;

- **The Natatorium**, yet it does not state that this facility is used for swim meets/competitions, diving competitions, or weight lifting, among other obvious

---

[2] The University of Wisconsin's Master Plan, which is an over 300-page PDF, is available at the City of Madison's website. *See* City of Madison Legislative Information Center, File #47245 (May 9, 2017), https://madison.legistar.com/LegislationDetail.aspx?ID=3100720&GUID=CA974453-66D0-4FE5-BA1C-57FA39D 1C69D (Attachments 7–11).

- 16 -

activities for which the university has used the Natatorium both before and after the effective date of its master plan;

- **The Goodman Softball Complex**, yet it does not state that this open space is used for softball games, among other obvious activities for which the university has used the Goodman Softball Complex both before and after the effective date of its master plan;

- **The McClimon Track Facility**, yet it does not state that this open space is used for track & field meets or team practices, among other obvious activities for which the university has used the McClimon Track Facility both before and after the effective date of its master plan;

- **The Near West Fields**, yet it does not state that this open space is used for intramural athletic contests, club sport contests, or other athletic competitions or practices, among other obvious activities for which the university has used the Near West Fields both before and after the effective date of its master plan;

- **The Near East Fields**, yet it does not state that this open space is used for intramural athletic contests, club sport contests, or other athletic competitions or practices, among other obvious activities for which the university has used Near East Fields both before and after the effective date of its master plan.

95.    Additionally, for example, the University of Wisconsin Master Plan identifies these other facilities and open spaces:

- **The Memorial Union and Memorial Union Terrace**, yet it does not state that this facility and open space is used for weddings and wedding receptions, concerts, meetings, or vending, among other obvious activities for which the

- 17 -

university has used these spaces both before and after the effective date of its master plan;

- **The Memorial Library**, yet it does not state that this facility is used for any activities;

- **Residence Halls**, yet it does not state that these facilities are used for any activities.

96.     The University of Wisconsin Master Plan does not identify or describe the University Bay Fields or the Cole Recreation Area, both of which host athletic contests.

97.     The University of Wisconsin Master Plan does not include an exhaustive list of activities for any identified facility or open space, including the facilities and open spaces described above.

## THE ZONING ADMINISTRATOR'S DISCRIMINATORY AND ARBITRARY ENFORCEMENT ACTIONS AGAINST EDGEWOOD

98.     Despite Edgewood's nearly 100 years of open use of its athletic field, Administrator Tucker claimed that he did not become "aware of the extensive use of the [Edgewood] athletic field" until after he attended an October 17, 2018 "neighborhood meeting." **Exhibit J**, Email from Matthew Tucker, dated Oct. 26, 2018.

99.     Shortly thereafter, Administrator Tucker notified Edgewood that he believed its use of its athletic field for "athletic contests" was "outside of the allowances" under Edgewood's Master Plan.  **Exhibit J**.

100.    According to Administrator Tucker's interpretation and application of Madison's land use regulations, Edgewood may *only* use its field for "team practices and physical education classes"—any other use or activity is prohibited.

101.     Administrator Tucker's interpretation arbitrarily distinguishes between team practices and physical education classes on one hand and "athletic contests" on the other—even though neither he nor the City has defined "athletic contests."

102.     According to Administrator Tucker's interpretation and application of Madison's land use regulations, Edgewood is prohibited from using its field for such uses as an outdoor Mass or prayer service, a graduation ceremony, community outreach events (such as the long-running Monroe Street Farmer's Market).

103.     Madison's Zoning Code does not distinguish between whether indoor or outdoor sports and recreation facilities, stadiums, auditoriums, or arenas may be used to host team practices, physical education classes, or athletic contests.

104.     It is arbitrary and irrational to say that one school can use its athletic field for "athletic contests," but another school with the same zoning classification cannot use its athletic field for the same purpose.

105.     It is arbitrary and irrational to say that one school can use its athletic field for "team practices" but not for "athletic contests," but another school with the same zoning classification can use its athletic field for either or both activities.

106.     In attempt to support his interpretation, Administrator Tucker cited Section 3.8 of Edgewood's Campus Master Plan, entitled "Open Space Plan" and located within the "Proposed Conditions" part of the plan, which "identifies the athletics field to be used for 'team practices, physical education practices,'" in the future.  **Exhibit J**; *see* **Exhibit A**, Edgewood Master Plan 20, 47.

107.     Administrator Tucker ignored other passages of the Edgewood Master Plan where Edgewood described the use of its athletic field as being for an "athletic field" and "recreation

- 19 -

space" – just like the University of Wisconsin-Madison describes many of its outdoor and indoor athletic fields and facilities.

108.    Edgewood identified team practices and physical education classes as examples of activities which will occur on its athletic field in the future during the term of the Master Plan but did not intend, and never would have intended, these examples to be read as an exhaustive and restrictive list of activities to be performed on the field for a ten-year period.

109.    Administrator Tucker arbitrarily decided to interpret these examples of athletic activities as a restrictive list that the City is now using to bar Edgewood and its students from engaging in any other activities on the field.

110.    According to the Administrator Tucker, *any* "programming" outside of the two activities Mr. Tucker dubs "team practices and physical education classes"—including "athletic contests"—is not an allowed activity on the athletic field. **Exhibit J**, Email from Matthew Tucker, dated Oct. 26, 2018.)

111.    Team practices and physical education classes involve athletic contests, as does calling an open space an "athletic field."

112.    According to a Code Enforcement Worksheet produced by the City, City Inspector Jacob Moskowitz was tasked sometime in 2019 with surveilling Edgewood's girls' soccer games.  **Exhibit K**, Code Enforcement Worksheet produced by Inspector Jacob Moskowitz.

113.    In his worksheet, Inspector Moskowitz noted four different dates on which the Edgewood girls' soccer team was playing soccer on the soccer field.  He also noted that the "national anthem was played as both teams stood in a line in the center of the field." **Exhibit K**.

114.    Based on Inspector Moskowitz's surveillance observations, Administrator Tucker issued an "Official Notice" against Edgewood on April 1, 2019.  **Exhibit L**, Official Notice, dated April 1, 2019.

115.    The notice asserted that Edgewood violated Section 28.097 by holding "athletic contests" on its athletic field, on the grounds that "[t]he Campus Master Plan states that the athletic field is used for team practices and physical education classes" only.  **Exhibit L**.

116.     The notice then ordered Edgewood to "[d]iscontinue holding athletic contests on [its] athletic field."  **Exhibit L**.

117.    A second "Official Notice" from the Zoning Administrator followed on May 15, 2019.  **Exhibit M**, Official Notice, dated May 15, 2019.

118.    This notice again asserted that Edgewood violated Section 28.097, specifically with regard to "athletic contests taking place on the athletic field" in March, April, and May.  **Exhibit M**.

119.    The second Official Notice listed seven separate violations, including the violations listed in the first notice.  These "violations" included the playing of high-school girls' soccer games, a boys' lacrosse game, and a track meet.

120.    The notices also stated that "[a]ny person violating any provision of the City Ordinances enforced by the Building Inspection Division is subject to the penalties provided by the appropriate Ordinance violated."  **Exhibit M**.

121.    Pursuant to M.G.O. § 28.207 (Penalties), Edgewood is subject to a fine of up to $1,000 for each violation, and each day or portion thereof the alleged violation continues shall be considered a separate offense.

122.     The City departed from normal zoning practices in its treatment of Edgewood's use of its property.

123.     The expressions of community bias were followed by irregularities in the City's interpretation and enforcement of its land use regulations.

124.     None of the other schools located in the Campus-Institutional District have received a zoning violation or alleged to be in violation of the City's Zoning Code for hosting an athletic contest on its athletic field.

125.     On February 22, 2019, Edgewood, in accordance with the City's outdoor lighting ordinance, submitted to the City an application for Outdoor Lighting for its athletic field.

126.     On February 27, 2019, the Building Inspection Division reviewed and *approved* Edgewood's application. **Exhibit N**, City of Madison Site Plan Verification.

127.     Soon afterward, the City informed Edgewood that it would not release the approved electrical permits for the installation and use of the lights in the new lighting system. The City claimed that allowing Edgewood to install the lights would violate Edgewood's Master Plan because the Master Plan did not identify the location or height of the light poles.

128.     The City had also previously granted electrical permits for the installation and use of lights in lighting systems at the Madison Memorial High School athletic complex. **Exhibit O**, City Electrical Permit for Madison Memorial High School.

129.     Edgewood's application matched Madison Memorial High School's application, which was approved and installed without any opposition from the city.

130.     Edgewood intends to continue using its athletic field to host athletic contests and pursue its religious mission through athletics on the field for these activities are all compelled by

and integral to the sincerely held religious beliefs and mission of the Dominican Sisters of Sinsinawa and of Edgewood.

131.     Edgewood intends to continue using its athletic field for other uses related to the institution's primary religious mission and in furtherance of its sincerely held religious beliefs.

132.     If the City's prohibition of the Edgewood's uses is upheld, Edgewood will be required to completely forego hosting athletic contests and other religious land uses on its field—which Edgewood has improved and used for such uses for nearly a century – until its Master Plan expires in 2024.

133.     If Edgewood is not allowed to continue hosting athletic contests on its athletic field, Edgewood will experience the following additional burdens:

a.     Edgewood will incur substantial expense to secure other locations at which its students can participate in "athletic contests";

b.     Edgewood will forfeit most of the value of the rebuilt field and track;

c.     Edgewood and its students will suffer significant additional aggravation and inconvenience of not being able to play their games on Edgewood's on-campus athletic field;

d.     Edgewood will face fines of up $1,000 a day if it chooses to engage in or allow any activity on its athletic field other than "team practices" and "physical education classes";

e.     Edgewood and its students will be cast in a false and negative light in the community; and

f.     Edgewood will be unable to offer existing and potential students the ability to compete in athletic contests on campus, which could adversely affect enrollment at the

school, particularly from the underserved communities Edgewood is trying to reach and minister to within Madison.

## FURTHER ALLEGATIONS CONCERNING THE
## UNIVERSITY OF WISCONSIN'S NIELSEN TENNIS STADIUM

134.    In 2018, after the City approved its Master Plan, the University of Wisconsin began its Nielsen Outdoor Tennis Court Expansion project.  **Exhibit P**, Nielsen Outdoor Tennis Court Expansion Documents.

135.    This project replaced all of the surfacing and fencing of the existing Nielsen Stadium.  It also added two additional outdoor tennis courts, outdoor fencing, outdoor seating, outdoor lighting, an outdoor sound system, and landscaping.

136.    In its site plan review application submitted to the City, the University of Wisconsin described the use of the Nielsen Stadium as authorized by Section 28.097(3) within the Campus Institutional District Ordinances.

137.    This site plan review application does not further describe the use of the Nielsen Stadium.  Nor does it disclose that the University of Wisconsin intends to host competitive tennis matches or other outdoor athletic contests at Nielsen Stadium.

138.    The University of Wisconsin's Master Plan did not disclose many details of the Nielsen Outdoor Tennis Court Expansion project.  For example, the University of Wisconsin's Master Plan does not disclose the university's plan to construct new outdoor courts, outdoor seating, outdoor lights, or an outdoor sound system, all of which it has since done.

139.    Additionally, as related to the outdoor lights, the University of Wisconsin's Master Plan did not disclose the location or height of any of the light poles.

140.     The Nielsen Outdoor Tennis Court Expansion is mentioned only briefly in the University of Wisconsin's Master Plan.

- 24 -

141.    The City approved the University of Wisconsin's site plan review application for the Nielsen Outdoor Tennis Court Expansion project.

142.    The City did not require the University of Wisconsin to amend its Master Plan in order to complete the Nielsen Outdoor Tennis Court Expansion project.

143.    The University of Wisconsin has completed the Nielsen Outdoor Tennis Court Expansion project, and the Nielsen Stadium is currently fully operational, including hosting athletic contests.

## THE HEARING AT THE ZONING BOARD OF APPEALS

144.    On May 31, 2019, Edgewood filed a timely appeal to the Zoning Board, challenging the Official Notices.  **Exhibit Q**, Edgewood Notice of Appeal to ZBA.

145.    On July 11, 2019, the Zoning Board held a duly noticed public hearing on Edgewood's appeal.  **Exhibit R**, Transcript of ZBA Hearing.

146.    The Zoning Board is composed of five members, one of whom serves as chairperson.

147.    The chairperson does not vote on the appeal or participate in deliberations, unless his vote is needed as a tiebreaker.

148.    At the close of this hearing, all four members of the Zoning Board who were allowed to deliberate and vote on Edgewood's appeal voted to deny Edgewood's appeal and affirm Administrator Tucker's Notices of Violations against Edgewood, thus prohibiting Edgewood from holding athletic contests on its athletic field.

149.    The chairperson did not vote, because his vote was not needed for a tiebreaker.

150.    The Zoning Board did not enter a formal opinion explaining the legal rationale for its decision.

151.    While members had the opportunity *individually* to explain their rationale to the public prior to entering their vote, only three members did so.

152.    The day after the Zoning Board of Appeals' hearing, the City Attorney sent a letter to Edgewood's counsel stating that "[f]urther enforcement of the zoning code, the ZBA decision, and the notices of violation now rests with the discretion of the City Attorney." **Exhibit S**, Letter from City Attorney Michael P. May to Attorney Matthew Lee (July 12, 2019).

153.    On July 18, 2019, the Zoning Board of Appeals issued its official letter confirming its denial of Edgewood's appeal.  **Exhibit T**, Letter from Winn Collins, ZBA Chair, dated July 18, 2019.  The letter was received by the Office of the City of Madison's Building Inspection Division on July 22, 2019, which became the official date of filing of the Zoning Board of Appeals' decision.  **Exhibit U**, Email from Administrative Clerk of the City of Madison Building Inspection Division.

## COUNT I
### Violation of the Religious Land Use and Institutionalized Persons Act
### Equal Terms Claim, 42 U.S.C. § 2000cc(b)(1)

154.    The allegations contained in all preceding paragraphs are incorporated here by reference.

155.    Congress defined "religious exercise" to broadly include:

"any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."

42 U.S.C. 2000cc-5(7).

156.    Congress further directed that RLUIPA should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."  42 U.S.C. 2000cc-3(g).

- 26 -

157.    Under RLUIPA's Equal Terms provision, "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).

158.    The plaintiff bears the initial burden of "produc[ing] prima facie evidence to support a[n equal terms] claim," and thereafter "the government . . . bear[s] the burden of persuasion on any element of the claim."  42 U.S.C. § 2000cc–2(b).

159.    A claimant must produce *prima facie* evidence that: (1) the claimant is a religious assembly or institution, (2) subject to a land use regulation that (3) treats the religious assembly or institution on less than equal terms, with (4) a nonreligious assembly or institution.  42 U.S.C. § 2000cc(b)(1)).

160.    Edgewood is a religious institution.

161.    Edgewood's use of its field is subject to the City's land use regulations, which include but are not limited to the City's Zoning Code, Administrator Tucker's interpretations and enforcement actions, and the Zoning Board's decision.

162.    The City has treated Edgewood on less than equal terms with the non-religious institutions located and operating within the City's Campus-Institutional District.

163.    Edgewood is no different than the nonreligious high schools or the University of Wisconsin from the standpoint of the accepted zoning criteria in the Campus-Institutional District.

164.    The City has allowed the nonreligious schools in the Campus-Institutional Zoning District, including the public high schools and the University of Wisconsin, to continue to use their athletic fields and facilities for athletic contests and other uses related to their primary missions but is prohibiting Edgewood from doing the same.

- 27 -

165.    The City has allowed the nonreligious schools in the Campus-Institutional Zoning District, including the four public high schools and the University of Wisconsin, to continue to use their athletic fields and facilities and to erect adequate lighting for athletic contests but is prohibiting Edgewood from doing the same.  **Exhibit V**, Comparison Chart of Wisconsin Public Schools and Edgewood Facilities.

166.    The City has allowed the University of Wisconsin to construct new outdoor athletic facilities pursuant to the University of Wisconsin's Master Plan and to use them for athletic contests, even though the University of Wisconsin did not identify "athletic contests" as an existing or future use of its fields.

167.    For example, the City has allowed the University of Wisconsin to construct a new tennis stadium with one thousand new seats and stadium lighting in its Campus-Institutional District and to use it for athletic contests, even though the University of Wisconsin did not identify "athletic contests" as an existing or future use of the stadium or mention the new stadium lighting in its master plan.

168.    The City, however, is prohibiting Edgewood from using its athletic field for athletic contests and prohibited Edgewood from installing lights, even after Edgewood's lighting application was approved by the City.

169.    The City's disparate treatment of Edgewood's religious land uses is an as-applied violation of the equal terms provision of RLUIPA.

170.    The City's disparate treatment of Edgewood's use of its athletic field with approved lighting is an as-applied violation of the equal terms provision RLUIPA.

171.    By issuing notices of violation only to Edgewood and not to the University of Wisconsin—even though both use their athletic fields for the same use, and neither explicitly or

- 28 -

exhaustively list that use in their Master Plans—Administrator Tucker has violated RLUIPA's Equal Terms provision.

172. By overseeing Administrator Tucker and failing to use his authority to correct his Equal Terms violation, Director Hank has also violated RLUIPA's Equal Terms provision.

173. By denying Edgewood's appeal of Administrator Tucker's notices of violation, thus affirming the issuance of Administrator Tucker's notices of violation, the Zoning Board has violated RLUIPA's Equal Terms provision.

174. As a direct result of the City's violations of Edgewood's rights under 42 USC § 2000cc(b), as alleged above, Edgewood is suffering irreparable harm for which there is no adequate remedy at law.

175. Furthermore, as a direct result of the City's violations of Edgewood's rights under 42 USC § 2000cc(b), as alleged above, Edgewood has suffered damages and is entitled to recover equitable relief, costs, and attorney fees.

176. WHEREFORE Edgewood is entitled to the relief requested below.

## COUNT II
### Violation of the Religious Land Use and Institutionalized Persons Act
### Substantial Burden Claim, 42 U.S.C. § 2000cc(b)(1)

177. The allegations contained in all preceding paragraphs are incorporated here by reference.

178. Congress provided in Section 2(a)(1) of RLUIPA statutory protections for "religious exercise" as follows:

> "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . is in furtherance of a compelling government interest [and] is the least restrictive means of furthering that compelling government interest."

- 29 -

42 U.S.C. 2000cc(a)(1).

179.    The City has made an "individualized assessment" of Edgewood's land uses within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

180.    The City's imposition of its land use regulations on Edgewood's use of its field affects "commerce among the several States" within the meaning of 42 U.S.C. § 2000cc(a)(2)(B).

181.    If the plaintiff can show that a land use regulation has been implemented or imposed in a manner that substantially burdens its religious exercise, then the burden shifts to the government to show the burden furthers a compelling government interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-2(b).

182.    A land use decision that prevents a religious institution from building new facilities or using its existing facilities to meet its religious needs and those of its members imposes a substantial burden on that institution's religious exercise.

183.    The City's decision to deny and restrict Edgewood's continued use of its field and to provide lighting for the same substantially inhibits Edgewood's religious exercise by preventing the school, a religious institution, from using its existing facilities to meet its religious needs and those of its students.

184.    The City's imposition of its land use regulations directly contrary to their plain meaning to deny and restrict Edgewood's use of its track and field is a substantial burden on Edgewood's religious exercise that is not supported by a compelling governmental interest, nor is it the least restrictive means of furthering any compelling governmental interest.

4844-6381-4818.1

185. The manner in which the City has imposed its land use regulations to deny and restrict Edgewood's use of its track and field is not supported by a compelling governmental interest, nor is it the least restrictive means of furthering any compelling governmental interest.

186. Accordingly, the City has imposed a "substantial burden" on Edgewood's religious exercise by restricting its ability to use its athletic field that does not pass strict scrutiny, in violation of the Religious Land Use and Institutionalized Persons Act, 42 USC § 2000cc(a)(1).

187. The City has imposed its land use regulations in a manner which has placed substantial pressure on Edgewood and its students to modify their behavior and violate their religious beliefs.

188. Edgewood is unable to fully live out its mission of forming students for spiritual, academic and personal excellence because its students do not have the necessary access to the athletic field to participate in athletic contests and other uses related to the institution's primary mission. Edgewood students are unable, in this way, to uphold Edgewood's Mission Statement and several integral aspects of a Sinsinawa Dominican education.

189. The City's actions have created considerable delay, expense and uncertainty for Edgewood in its efforts to use its field.

190. The City's denial has caused Edgewood to suffer significant financial loss, including, but not limited to, attorneys' fees, professional fees, and costs from the inability to host athletic contests on its athletic field.

191. By issuing notices of violation to Edgewood for hosting athletic contests on its athletic fields, Administrator Tucker has imposed a substantial burden on Edgewood's religious exercise with no compelling reason, thus he has violated RLUIPA's Substantial Burden provision.

192.     By overseeing Administrator Tucker and failing to use his authority to correct his Substantial Burden violation, Director Hank has also violated RLUIPA's Substantial Burden provision.

193.     By denying Edgewood's appeal of Administrator Tucker's notices of violation, thus affirming the issuance of Administrator Tucker's notices of violation, the Zoning Board has violated RLUIPA's Substantial Burden provision.

194.     As a direct result of the City's violations of Edgewood's rights protected under 42 USC § 2000cc(a) of the Act, Edgewood is suffering irreparable harm for which there is no adequate remedy at law.

195.     Furthermore, as a direct result of the City's violations of Edgewood's rights under 42 USC § 2000cc(a) of the Act as alleged above, Edgewood is entitled to equitable relief and the recovery of its costs and attorney fees.

196.     WHEREFORE Edgewood is entitled to the relief requested below.

## COUNT III
### Violation of M.G.O. § 28.097,
### Appeal of ZBA Decision Pursuant To Wis. Stat. § 62.23(7)(e)10

197.     Under Wis. Stat. § 62.23(7)(e)10, "[a]ny person . . . aggrieved by any decision of the board of appeals . . . may, within 30 days after the filing of the decision in the office of the board of appeals, comment an action seeking the remedy available by certiorari."

198.     Edgewood's right to use its property for athletic contests is protected by M.G.O. § 28.097.

199.     In upholding the Zoning Administrator's enforcement actions, the Zoning Board has infringed that right.

200.     The Zoning Board's ruling upholding Administrator Tucker's enforcement actions was rife with errors of fact and law.

- 32 -

201.    Accordingly, Edgewood is "aggrieved by [the] decision of the board of appeals." Wis. Stat. § 62.23(7)(e)10.

202.    A state-law claim seeking a remedy for such injury falls within this Court's supplemental jurisdiction.  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 118 (1997).

## COUNT IV
### Violation of Edgewood's Rights Under the First Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment

203.    The allegations contained in all preceding paragraphs are incorporated here by reference.

204.    The City's prohibition of Edgewood's use of its field for any activities other than team practices and physical education classes violates Edgewood's and its students' freedom of speech as it prohibits Edgewood and its students from engaging in any speech or speech related activity on the field.

205.    The City's prohibition of Edgewood's use of its field for any activities other than team practices and physical education classes violates Edgewood's and its students' freedom of assembly as it prohibits Edgewood and its students from assembling on the field for any purpose other than team practices and physical education classes.

206.    The City's prohibition of Edgewood's use of its field for any activities other than team practices and physical education classes directly burdens Edgewood's religious practices and fails to satisfy the requirements of neutrality and general applicability.

207.    The City's prohibition of Edgewood's use of its field for any activities other than team practices and physical education classes impermissibly regulates Edgewood's assemblies and speech based on their content.

- 33 -

208.     The City's prohibition of Edgewood's use of its field for any activities other than team practices and physical education classes violates Edgewood's hybrid rights of free exercise, freedom of assembly, freedom of association, and freedom of speech.

209.     The City has made a content based regulation of Edgewood's expressive conduct and assemblies that is subject to strict scrutiny.

210.     The City's prohibition is not justified by a compelling government interest nor narrowly tailored to advance any such interest.

211.     By issuing notices of violation to Edgewood for hosting athletic contests on its athletic fields, Administrator Tucker has infringed Edgewood's First Amendment protected activity with no compelling reason, thus he has violated the First Amendment, as incorporated.

212.     By overseeing Administrator Tucker and failing to use his authority to correct his First Amendment violation, Director Hank has also violated the First Amendment, as incorporated.

213.     By denying Edgewood's appeal of Administrator Tucker's notices of violation, thus affirming the issuance of Administrator Tucker's notices of violation, the Zoning Board has violated the First Amendment, as incorporated.

214.     WHEREFORE Edgewood is entitled to the relief requested below.

## COUNT V
### Violation of the Edgewood's Due Process Rights
### as Prohibition of "Athletic Contests" is Void-for-Vagueness

215.     The allegations contained in all preceding paragraphs are incorporated here by reference.

216.     The City has declared that Edgewood is not permitted to hold "athletic contests" on its athletic field.

- 34 -

217.    The City has not defined the term "athletic contests" and without a definition the prohibition of "athletic contests" is void for vagueness.

218.    Persons of common intelligence must necessarily guess at the meaning of "athletic contests" and differ as to its application.

219.    The City's prohibition of "athletic contests" vests virtually complete discretion in the hands of the Zoning Administrator and fails to provide the minimal guidelines required for due process.

220.    By issuing notices of violation to Edgewood based on an impermissibly vague ordinance Tucker has violated the Due Process Clause.

221.    By overseeing Tucker and failing to use his authority to correct his due process violation, Hank has also violated the Due Process Clause, as incorporated.

222.    By denying Edgewood's appeal of Tucker's notices of violation, thus affirming the issuance of Tucker's notices of violation, the Zoning Board of Appeals has violated the Due Process Clause.

223.    WHEREFORE Edgewood is entitled to the relief requested below.

## COUNT VI
## Violation of the Wisconsin State Constitution

224.    The allegations contained in all preceding paragraphs are incorporated here by reference.

225.    Article I, Section 18 of the Wisconsin Constitution provides:

**Freedom of worship; liberty of conscience; state religion; public funds.** The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

- 35 -

WI Const. Art. 1, § 18.

226.     In *Coulee Catholic Sch. v. Labor & Indus. Review Comm'n*, 2009 WI 88, ¶ 61, 320 Wis. 2d 275, 768 N.W.2d 868, the Wisconsin Supreme Court interpreted Article I, Section 18 of the Wisconsin State Constitution to mean that strict scrutiny is to be applied to any situation involving violations of an individual or organization's freedom of conscience.

> When faced with a claim that a state law violates an individual or organization's freedom of conscience, we have generally applied the compelling state interest/least restrictive alternative test. Under this test, the religious organization has to prove (1) that it has a sincerely held religious belief, and (2) that such belief is burdened by the application of the state law at issue. Upon this showing, the burden shifts to the state to prove (3) that the law is based upon a compelling state interest (4) that cannot be served by a less restrictive alternative.

*Id.* at 886.

227.     In *Coulee*, the Wisconsin Supreme Court established a framework by which religious freedom claims are analyzed. In this case, Edgewood has the burden to prove that (1) it has a sincerely held religious belief and that (2) its sincerely held religious belief is burdened by the City's application of its zoning laws. The burden then shifts to the City to prove (1) that the zoning laws at issue are based upon a compelling state interest and that (2) the interest cannot be served by a less restrictive means. *Id.*

228.     The City cannot provide a compelling state interest for its application of the zoning laws to Edgewood and the resultant burden on Edgewood's exercise of its sincerely held religious beliefs.  There is no compelling state interest for prohibiting, at all times, high school aged children from playing games on an athletic field.

229.     Even if it could provide a compelling state interest for its treatment of Edgewood, the City cannot prove that its actions are the least restrictive means of achieving that interest.

230.     By prohibiting Edgewood from playing games and engaging in other activities which further the religious mission of the school on its athletic field during the life of the Master Plan, the City has imposed a burden on Edgewood's exercise of its sincerely held religious beliefs, the City's actions constitute an "unlawful" and unnecessary "interference" with Edgewood's "rights of conscience."  *Id.*

231.     By prohibiting Edgewood from playing games and engaging in other activities which further the religious mission of the school on its athletic field during the life of the Master Plan, the City has violated Article I, Section 18 of the Wisconsin Constitution by burdening Edgewood's constitutionally-protected religious exercise and imposing its zoning laws on Edgewood in a manner that interferes with Edgewood's religious freedom.

232.     By issuing notices of violation to Edgewood for hosting athletic contests on its athletic fields, Administrator Tucker has infringed Edgewood's Article I, Section 18 protected activity with no compelling reason, thus he has violated Article I, Section 18.

233.     By overseeing Administrator Tucker and failing to use his authority to correct his Article I, Section 18 violation, Director Hank has also violated Article I, Section 18.

234.     By denying Edgewood's appeal of Administrator Tucker's notices of violation, thus affirming the issuance of Administrator Tucker's notices of violation, the Zoning Board has violated Article I, Section 18.

235.     WHEREFORE Edgewood is entitled to the relief requested below.

## COUNT VII
## Violation of Edgewood's Vested Property Rights

236.     The allegations contained in all preceding paragraphs are incorporated here by reference.

- 37 -

237.    Under Wisconsin law, a property owner's rights vest upon submittal of an application for a building permit that conforms to the zoning or building code requirements in effect at the time of application.

238.    Edgewood submitted an application pursuant to and in compliance with Chapter 10 of the City of Madison ordinances for Outdoor Lighting for its Edgewood Campus on February 22, 2019.

239.    As shown on the attached City of Madison Site Plan Verification page, the application was reviewed *and approved* for compliance with lighting and zoning on February 27, 2019 and March 1, 2019.

240.    Edgewood's rights vested upon the submittal of its compliant and City-approved application.

241.    Edgewood's Master Plan explicitly and intentionally addresses outdoor lighting and related height standards in Section 3.6 "Architectural Guidelines For Perimeter Buildings."

242.    The Master Plan notes in Subsection 7 of Section 3.6 the following self-imposed additional requirements for outdoor lighting beyond compliance with the City's Outdoor Lighting Ordinance (emphasis added):

    7. <u>Site and Building Lighting</u>

      a.  Utilize dark sky compliant light fixtures

      b.  Provide lighting that is required for pedestrian safety and building code required exit lighting. Reduce glare and light spill towards the neighborhood, ***use lower height site lighting*** with non-glare and cut off shielding.

243.    Edgewood conformed the height of its light poles (80 feet) to match lighting approved and installed at Mansfield Stadium at Memorial High School in 2018 as that facility

- 38 -

has (i) residential neighbors in close proximity to their lights and athletic fields, just like Edgewood, and (ii) has the same zoning classification as Edgewood.

244.   The City is also arbitrarily and capriciously insisting that the default height for Edgewood's light poles is zero (0) feet.

245.   The City is arbitrarily and capriciously withholding the electrical permits necessary to erect Edgewood's approved and compliant lighting structures on its athletic field.

246.   The City permitted University of Wisconsin to install and use 60 foot tall stadium lights at its new Nielsen Tennis Stadium even though University of Wisconsin's Master Plan did not identify the height of the light poles.

247.   WHEREFORE Edgewood is entitled to the relief requested below.

## COUNT VIII
## Violation of Madison General Ordinance § 10.085

248.   The allegations contained in all preceding paragraphs are incorporated here by reference.

249.   Under Section 10.085, Edgewood has a clear legal right to receive its already approved electrical permit from the City and from Hank.

250.   Likewise, Defendants have a clear legal duty under Section 10.085 to deliver the already approved electrical permit to Edgewood.

251.   Defendants' refusal to comply with Section 10.085 by timely delivering the permit has caused and will continue to cause substantial injury to Edgewood.

252.   Defendants' refusal to comply with Madison General Ordinance 10.085 is further evidence of the Defendants' unequal treatment of Edgewood.

253.   Unless this Court grants relief, Plaintiffs have no other adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Edgewood respectfully requests a judgment against Defendants and that this Honorable Court:

a.      Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

b.      Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that Edgewood may immediately continue to use its athletic field for athletic contests and other uses related to the school's primary religious mission in furtherance of its religious mission and beliefs as it has for nearly a century;

c.      Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 64, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-4 preliminarily and permanently enjoin the City from enforcing its zoning ordinances to prevent Edgewood from using its athletics field and to process and issue all permits and grant all other rights and privileges to Edgewood to use its athletics field on equal terms with nonreligious institutions located in a Campus-Institutional District;

d.      Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2(a), award Edgewood all necessary and appropriate relief including compensatory and nominal damages;

e.      Declare that Defendants have violated M.G.O. § 28.097 and nullify the Zoning Administrator's enforcement actions;

f.      Declare that Defendants have violated Edgewood's rights under the First and Fourteenth Amendments of the United States Constitution;

4844-6381-4818.1

g.      Declare that the City's prohibition of Edgewood's use of its field is arbitrary and capricious;

h.      Pursuant to 42 USC § 1988, 42 USC § 2000cc-2(d), Fed. R. Civ. Pro. 54(d) and other applicable law, award Edgewood its reasonable attorneys' fees and other costs;

i.      Enter an order declaring that Defendants are in violation of M.G.O. § 10.085 for refusing to issue Edgewood the electrical permit, and ordering that Defendants issue the permit to Edgewood;

j.      Grant such other and further relief as the Court deems equitable, just and proper.

**Plaintiff demands trial by a jury of 12.**

Dated this 21ˢᵗ day of August 2019.                 Respectfully Submitted,

                                                    DALTON & TOMICH, PLC

                                                    *Noel W. Sterett (IL 6292008)
                                                    *Larry Opalewski (P 77864)
                                                    504 N. State Street
                                                    Belvidere, IL 61008
                                                    (815) 986-8050 (telephone)
                                                    (313) 859-8888 (facsimile)
                                                    nsterett@daltontomich.com
                                                    lopalewski@daltontomich.com

                                                    *Pending Admission *Pro Hac Vice*

                                                    FOLEY & LARDNER LLP

                                                    *s/Matthew D. Lee*
                                                    Matthew D. Lee (WI Bar No. 1061375)
                                                    Kevin M. LeRoy (WI Bar No. 1105053)
                                                    150 E. Gilman Street
                                                    P.O. Box 1497
                                                    Madison, WI 53701-1497
                                                    (608) 257-5035 (telephone)
                                                    (608) 258-4258 (facsimile)
                                                    mdlee@foley.com
                                                    kleroy@foley.com

                                                    *Attorneys for Plaintiff*

- 41 -